UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff/Respondent,<br><br>v.<br><br>TONY LEE MCLEOD,<br><br>                    Defendant/Petitioner. | Case Nos.:  13-CR-2297 JLS<br>                    20-CV-853 JLS<br><br>**ORDER: (1) DECLINING TO HOLD EVIDENTIARY HEARING; (2) DENYING PETITIONER'S MOTION UNDER 28 U.S.C. § 2255; (3) DENYING PETITIONER'S MOTIONS TO APPOINT COUNSEL; (4) DENYING AS MOOT PETITIONER'S REQUEST FOR EXTENSION AND DISCOVERY MOTION; AND (5) DENYING CERTIFICATE OF APPEALABILITY**<br><br>(ECF Nos. 240, 263, 271, 272, 275) |

Presently before the Court are Defendant/Petitioner Tony Lee McLeod's ("Petitioner" or "McLeod") "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody" ("Mot.," ECF No. 240)[1]; Petitioner's

---

[1] Unless otherwise indicated, citations to ECF numbers refer to the docket in the criminal matter (13-CR-2297).  Furthermore, all pincites to documents in the record refer to the blue numbers Bates-stamped in the upper righthand corner by the District's CM/ECF system, with the exception of citations to

1

"Ex Parte Motion for Leave Pursuant to 28 U.S.C. 2255 Rule 6 Discovery, and 18 U.S.C. 3006A Appointment of Counsel for Indigent Petitioner" ("Disc. Mot.," ECF No. 263); Petitioner's "Renewal Motion for Appointment of Counsel" ("Counsel Mot.," ECF No. 271); Petitioner's "Amended Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255 by a Person in Federal Custody" ("Am. Mot.," ECF No. 272); Plaintiff/Respondent United States of America's (the "Government") Response in Opposition ("Opp'n," ECF No. 274); Petitioner's "Amended Motion for Appointment of Counsel and Request for Extension" ("Ext. Req.," ECF No. 275); and Petitioner's "Travers to the United States Opposition to 28 U.S.C. § 2255" ("Traverse," ECF No. 276). Having considered the Parties' briefing, Petitioner's additional exhibits, the record in this case, and the law, the Court, for the reasons provided below, **DECLINES** to hold an evidentiary hearing, **DENIES** Petitioner's § 2255 Motion, **DENIES** Petitioner's Counsel Motions, **DENIES AS MOOT** Petitioner's Discovery Motion and Extension Request, and **DENIES** a Certificate of Appealability ("COA").

## GENERAL BACKGROUND

"[Petitioner]'s convictions stem from his interactions with two teenagers, Johnathan and Max," over the period from March 2013 through June 11, 2013. Am. Mot. at 25–26; *see generally* ECF No. 29. On June 17, 2013, a Complaint was filed and a Warrant for Arrest issued as to Petitioner for enticement of a minor. *See* ECF Nos. 1 & 2. On June 21, 2013, a grand jury returned a one-count Indictment for the same. *See* ECF No. 3. Petitioner was arrested on June 26, 2013, *see* ECF No. 7, and arraigned on July 26, 2013, at which time he entered a plea of not guilty, *see* ECF No. 10. Following a detention hearing, an Order of Detention was signed on August 6, 2013. *See* ECF No. 16. On January 10, 2014, a grand jury returned a Superseding Indictment that ultimately charged Petitioner, after the dismissal of several counts, with nine counts of sexual

---

Appellant's Excerpts of Record ("ER"), Case No. 16-50013 (9th Cir.), ECF No. 10, and Appellee's Supplemental Excerpts of Record ("SER"), Case No. 16-50013 (9th Cir.), ECF No. 23, which refer to the internal page numbers provided by the Parties.

exploitation and/or attempted sexual exploitation of a child, one count of traveling with the intent to engage in illicit sexual conduct, and one count of transportation of a minor with intent to engage in sexual activity.   *See* ECF No. 29; *see also* ECF No. 84 (dismissing counts 1 and 12); ECF No. 87 (dismissing count 14).

Petitioner's trial commenced on June 15, 2015, and lasted eight days.   *See* ECF Nos. 104–11.   The Government called as witnesses Johnathan's aunts; Johnathan; Detective Damian Jackson of the Escondido Police Department ("EPD"), who generated a Cellebrite report containing data extracted from Johnathan's Blackberry phone; Max; "a number of law enforcement witnesses"; Sarah Kranz, a forensics expert, who testified about her analysis of some of the technology at issue in the case; and Darren Bennett, a computer expert, who created a demonstrative exhibit that "bubblified" some of the text messages retrieved from Johnathan's phone.   Appellee's Answering Brief, Case No. 16-50013, 2017 WL 2021977, at *12–14 (9th Cir.).

Petitioner's defense as to the production counts was that he did not know the teenagers were minors, and, as to the travel and transportation counts, that he "was attempting to aid Johnathan from his abusive situation, and not for any sexual intentions." Am. Mot. at 27.   "The defense case focused on undermining the credibility of the government's witnesses" as well as establishing Petitioner's affirmative defenses. Appellant's Opening Brief, Case No. 16-50013, 2017 WL 75671, at *11 (9th Cir.). Petitioner called ten witnesses to testify in his defense, including flight attendants and passengers from the flight to Tampa, but did not testify in his own defense.   Appellee's Answering Brief, Case No. 16-50013, 2017 WL 2021977, at *14 (9th Cir.).

On June 25, 2015, the jury returned a verdict of guilty on all counts.   *See* ECF No. 115.   On January 6, 2016, Petitioner was sentenced to imprisonment for a term of 324 months as to each of counts 2 through 11 and 13 to run concurrently, to be followed by supervised release for a term of life; as well as a $100.00 assessment as to each count, for a total of $1,100.00.   *See* ECF Nos. 174, 177 & 179.   The same day, Petitioner filed a Notice of Appeal.   *See* ECF No. 173.   The Court subsequently amended the judgment to

order restitution, *see* ECF Nos. 212 & 213, and denied Petitioner's request for bail pending appeal, *see* ECF Nos. 195 & 217.

On appeal, Petitioner argued: (1) this Court abused its discretion in admitting Detective Jackson's Cellebrite testimony without a finding under Federal Rule of Evidence 702 that the testimony was reliable; (2) this Court abused its discretion in failing to exclude Johnathan's testimony that Petitioner molested him; (3) this Court should have severed the travel and transportation counts from the production counts; and (4) 18 U.S.C. § 2251 is unconstitutional because it does not require that the defendant know that the victim is a minor. *See generally* Appellant's Opening Brief, Case No. 16-50013, 2017 WL 75671 (9th Cir.). In a February 6, 2019 Amended Memorandum Opinion, a panel of the Ninth Circuit affirmed Petitioner's conviction and denied his petition for rehearing and rehearing en banc, *see generally United States v. McLeod*, 755 F. App'x 670 (9th Cir. 2019), and the Mandate issued February 14, 2019, *see* ECF No. 233. On April 29, 2019, Petitioner's petition for writ of certiorari was denied by the Supreme Court. *See McLeod v. United States*, 139 S. Ct. 1641 (2019). On February 24, 2020, this Court granted Federal Defenders of San Diego's motion to withdraw as Petitioner's counsel, given Petitioner's intention to allege ineffective assistance of counsel in his anticipated § 2255 motion, and denied without prejudice Petitioner's motion for appointment of substitute counsel. *See* ECF No. 239.

On May 1, 2020, Petitioner filed the instant Motion. *See* ECF No. 240. The Court subsequently granted several motions to stay the § 2255 proceedings. *See, e.g.*, ECF Nos. 246, 251, 255, 257, 260, 265 & 269. Petitioner filed his Amended Motion on January 24, 2022, *see* ECF No. 272, and the Court requested a response from the Government, *see* ECF No. 273, which was timely filed, *see* ECF No. 275. Plaintiff thereafter filed his Traverse.[2] *See* ECF No. 276.

---

[2] Petitioner requested a 60-day extension of his time to respond to the Government's Opposition, *see* Ext. Req., but subsequently timely filed his Traverse, *see* Traverse. Accordingly, the Court **DENIES AS MOOT** Petitioner's Extension Request.

**EVIDENTIARY HEARING**

Petitioner requests an evidentiary hearing.  *See* Am. Mot. at 27.  However, a court is not required to hold an evidentiary hearing when ruling on a § 2255 motion.  *See Shah v. United States,* 878 F.2d 1156, 1159-60 (9th Cir. 1989).  Section 2255 allows a court to forego such a hearing when "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).

Here, the Court has considered the more than one hundred pages of additional exhibits submitted by Petitioner, which include communications from his counsel and purportedly new evidence, *see* Am. Mot. Exs. A–G; ECF No. 263 Exs. A–E; ECF No. 271 Ex. A; ECF No. 275 Ex. A, and which were briefed by the Parties, *see generally* Am. Mot., Reply; *see also* Opp'n at 27.  The Court finds that the voluminous record, so supplemented, conclusively demonstrates that Petitioner is not entitled to relief, for the reasons provided within this Order.  Accordingly, the Court, in its discretion, **DECLINES** to hold an evidentiary hearing.  *See, e.g.*, *United States v. Rodriguez-Vega*, 797 F.3d 781, 791 (9th Cir. 2015) (holding that oral evidentiary hearing not necessary on § 2255 motion where expanded record and supplemental briefing were adequate to permit resolution of issues raised in petition).  Moreover, because the Court finds that the record conclusively shows that Petitioner is entitled to no relief and an evidentiary hearing is unwarranted, the Court **DENIES AS MOOT** Petitioner's Discovery Request.

**§ 2255 MOTION**

Petitioner's Motion raises ten grounds for relief: (1) newly discovered evidence under 28 U.S.C. § 2255(f)(4); (2) ineffective assistance of trial counsel in failing to conduct a reasonable investigation of the law and facts; (3) ineffective assistance of trial counsel in failing to make meritorious objections or motions; (4) the Government's suppression of exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963); (5) denial of due process; (6) the Government's knowing presentation of false evidence; (7) appellate counsel's conflict of interest and/or ineffective assistance; (8) the unconstitutionality of 18 U.S.C. § 2251(a); (9) actual innocence; and (10) "the

cumulative effect of trial counsel's incompetent failures." Am. Mot. at 4–16. With the exception of ground eight and several of the due-process claims presented in ground five, none of these grounds were raised in Petitioner's direct appeal or by any other means. *See id.* Petitioner now seeks to have (1) his judgment and sentence vacated, and (2) the Court order a new trial and/or an evidentiary hearing. *Id.* at 27. The Government contends that Petitioner's claims for ineffective assistance of counsel are the only cognizable claims, as the others have been "either procedurally defaulted or . . . litigated on direct appeal."[3] Opp'n at 9. However, the Government also contends that all of Petitioner's grounds fail on the merits. *See generally id.*

The Court first addresses the question of procedural default and then addresses the merits of each ground in turn.

## I.   Procedural Default

As an initial matter, the Government contends that all grounds save those raising ineffective assistance of counsel and the constitutionality of 18 U.S.C. § 2251(a) have been procedurally defaulted. *See* Opp'n at 19–20.

"The general rule in federal habeas cases is that a defendant who fails to raise a claim on direct appeal is barred from raising the claim on collateral review." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 350–51 (2006) (citing *Massaro v. United States*, 538 U.S. 500, 504 (2003); *Bousley v. United States*, 523 U.S. 614, 621 (1998)). "'Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the

---

[3] In his Traverse, Petitioner claims that the Government "did not respond" to certain claims, which therefore should "be disposed of summarily in the Petitioner's favor." Traverse at 22. First, the Court does not agree with Petitioner's characterization of the Government's Opposition. The Government took the pragmatic and necessary step of addressing together claims that shared a common factual or legal nexus; even having done so, the Opposition clocks in at 29 pages. *See generally* Opp'n. But even assuming, for purposes of Petitioner's argument, that the Government erroneously failed to respond to one or more of Petitioner's 38 explicitly numbered claims and subclaims, the Court exercises its discretion to nonetheless evaluate and decide each argument on the merits. *See Brooks v. United States*, No. C09-650MJP, 2010 WL 2545403, at *4 (W.D. Wash. June 21, 2010) (rejecting § 2255 petitioner's argument that government conceded three arguments it failed to address in its response and finding magistrate judge had authority to analyze and decide those arguments on the merits).

claim may be raised in habeas only if the defendant can first demonstrate either "cause" and actual "prejudice" or that he is "actually innocent."'" *United States v. Braswell*, 501 F.3d 1147, 1149–50 (9th Cir. 2007) (quoting *Bousley*, 523 U.S. at 622; citing *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993)) (footnote omitted).

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," for example, "a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that some interference by officials . . . made compliance impracticable[.]" *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (internal citations and quotation marks omitted). Ineffective assistance of counsel also constitutes cause for a procedural default. *Id.* "If a petitioner succeeds in showing cause, the prejudice prong of the test requires demonstrating 'not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Braswell*, 501 F.3d at 1150 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)) (emphases in original).

Alternatively, "[t]o establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327–28 (1995)) (internal quotation marks omitted). "It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency." *Id.* at 623–24 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

For the reasons provided *infra*, the Court finds that the vast majority of Petitioner's grounds for relief were available to him at the time of his direct appeal, yet Petitioner has failed to establish cause for his failure to raise them at that time. He presents no credible evidence of interference by officials that would have made it impossible to present his claims on appeal. Further, for the reasons provided *infra*, Petitioner has failed to demonstrate either actual prejudice or actual innocence. Accordingly, for these reasons,

as well as those examined below, the Court finds that Petitioner has procedurally defaulted grounds 1, 4, 5, and 6.  Nonetheless, the Court will address each of these grounds on the merits as well.

## II. Ground 1: Newly Discovered Evidence

Petitioner's first ground for relief is premised on "newly discovered evidence."  As an initial matter, "claims solely based on new evidence are generally not cognizable on habeas." *United States v. Berry*, 624 F.3d 1031, 1038 (9th Cir. 2010) (citation omitted). "Rather, a motion under § 2255 must be based upon an independent constitutional violation." *Id.* (citing *Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("[N]ewly discovered evidence . . . alleged in a habeas application . . . must bear upon the constitutionality of the applicant's detention; *the existence merely of newly discovered evidence relevant to the guilt of a [] prisoner is not a ground for relief on federal habeas corpus.*" (emphasis in original))).  The proper device for asserting newly discovered evidence is a motion for a new trial under Federal Rule of Criminal Procedure 33.  *See id.*  Accordingly, Petitioner's first ground for relief is subject to dismissal on this basis.  Even were this ground for relief cognizable, however, each of Petitioner's subclaims fails on the merits.

First, Petitioner argues that he has newly discovered evidence pursuant to 28 U.S.C. § 2255(f)(4) that "the prosecution presented false testimony through its primary law enforcement witness and failed to correct it once the falsity appeared," resulting in "[Petitioner being] provided ineffective assistance of counsel in violation of 18 U.S.C. § 3006a." Am. Mot. at 29 (citation omitted).  The Court addresses this argument, which asserts both the purported ineffective assistance of Petitioner's trial counsel and a purported *Mooney-Napue* claim, *infra* at Sections III and V, respectively.

Second, Petitioner questions the accuracy of the Cellebrite data used in his trial. He submits as "newly discovered evidence" a 2020 Cellebrite UFED major software update, "Check-M8 Exploit," that "allows Cellebrite UFED to connect with and download data more accurately and reliably, and with more device support," than in 2013, when used in Petitioner's case.  Am. Mot. at 42.  He argues that his iPhone and

Johnathan's Blackberry "can and MUST be resubmitted for a new and full forensic extraction." *Id.*

However, challenges to the reliability of Cellebrite were available at the time of Petitioner's direct appeal—and, in fact, Petitioner raised such a challenge in his Opening Brief. *See, e.g.*, Appellant's Opening Brief, Case No. 16-50013, 2017 WL 75671, at *28–32, 34 (9th Cir.) (arguing the unreliability of Cellebrite). The Ninth Circuit rejected this contention. *See McLeod*, 755 F. App'x at 674 (noting that other evidence "independently supported the reliability of the information in the Cellebrite report"). "When a defendant has raised a claim and has been given a full and fair opportunity to litigate it on direct appeal, that claim may not be used as basis for a subsequent § 2255 petition." *United States v. Hayes*, 231 F.3d 1132, 1139 (9th Cir. 2000) (citing *United States v. Redd*, 759 F.2d 699, 700–701 (9th Cir. 1985)). Accordingly, Petitioner is barred from reraising this argument.

Even considering the claim on the merits, the existence of software updates to the technology previously used to extract electronic data in this case can hardly be classified as "newly discovered evidence." This is not a case where, for example, DNA incapable of being investigated at the time of trial can now be analyzed, even if the underlying physical objects on which the DNA resided existed at the time of trial. *Cf. United States v. Watson*, 792 F.3d 1174 (9th Cir. 2015). Rather, here, the data contained on the phone not only was capable of being extracted, but *was* extracted, at the time of Petitioner's trial. Petitioner's speculation that advances in technology may result in the retrieval of additional evidence that could be exculpatory simply is inadequate to merit relief.

Third and finally, Petitioner claims that "the government committed prosecutorial misconduct by arguing in bad-faith during both the district court and appellate court proceedings." Am. Mot. at 44. Essentially, Petitioner argues that the Government designated Detective Jackson as an expert witness in its pretrial memorandum and that the Court admitted Detective Jackson as an expert witness at trial over Petitioner's objections. *Id.* Petitioner claims that, on appeal, the Government argued that Detective

Jackson was not an expert witness and had testified at trial as a fact witness. *Id.* at 45. Petitioner asserts that the Ninth Circuit "adopted the United States['s] new arguments," but that this is "fundamentally unfair" because "McLeod's jury doesn't know that a higher Court changed Jackson's 'expert status' [AFTER] they chose to convict." *Id.* at 45–46 (emphasis in original). Petitioner claims this chain of events amounts to a due process violation. *Id.* at 46.

The Court, however, disagrees with the fundamental premise of Petitioner's argument: namely, that the Government "switched" Detective Jackson's status as an expert witness during the trial and/or the appeal. The only person who used the word "expert" in front of the jury with regard to Detective Jackson was Petitioner's counsel. *See, e.g.*, ER at 532–43. Neither the Court nor the Government indicated in open court that Detective Jackson was testifying as an expert witness. *See id.* Conversely, as to both Ms. Krantz and Scott Zoll, the parties explicitly tendered, and Court explicitly accepted, them as experts. *See, e.g.*, *id.* at 810–11, 986–87. Accordingly, it was reasonable for the Government to argue, and for the Ninth Circuit to conclude, that Detective Jackson was never offered or admitted as an expert during the trial, and there was no misleading statement before the jury to suggest a change in Detective Jackson's status. The Court further addresses Petitioner's due-process argument concerning the Government's alleged misrepresentations during the direct appeal *infra* at Section VI.

Accordingly, the Court **DENIES** Petitioner's Motion to the extent it is premised on purportedly newly discovered evidence.

## III.   Ground 2: Ineffective Assistance of Counsel—Failure to Investigate

Next, Petitioner claims that his trial counsel's failure to properly investigate certain evidence and issues requires the Court to vacate his conviction.

To establish a claim for ineffective assistance of counsel, "a convicted defendant must show (1) constitutionally deficient performance by counsel (2) that prejudiced the defense." *Washington v. Shinn*, 46 F.4th 915, 926 (9th Cir. 2022) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). In other words, "[i]n order to prevail, the

10

defendant must show both that counsel's representation fell below an objective standard of reasonableness . . . and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (citing *Strickland*, 466 U.S. at 688, 694). This standard "is highly demanding," and "[o]nly those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ[.]" *Id.* at 382 (footnote omitted). "The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000) [hereinafter "*Smith*"] (citing *Strickland*, 466 U.S. at 697).

Generally, "[r]eview of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation." *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1253 (9th Cir. 1986) (citing *United States v. Hamilton*, 792 F.2d 837, 839 (9th Cir. 1986)). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "Moreover, ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case." *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986). Ultimately, "the duty to investigate and prepare a defense is not limitless: it does not necessarily require that every conceivable witness be interviewed or that counsel must pursue 'every path until it bears fruit or until all conceivable hope withers.'" *United States v. Tucker*, 716 F.2d 576, 584 (9th Cir. 1983) (quoting *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980)).

First, Petitioner claims that his trial counsel, Leila Morgan, failed to adequately investigate the case by failing to interview Johnathan's mother, Cameron Ramirez,

concerning the Government's claim that she had washed airline blankets before turning them over to the authorities—the reason advanced, at least initially, by the Government as to why forensic examination of the blankets had revealed no evidence of semen. Am. Mot. at 47. This failure, Petitioner argues, "compromised counsel's ability to discover that the [Government] had manufactured this bogus claim in order to bolster the prosecution's case." *Id.* However, the Court finds that Ms. Morgan reasonably could have decided that the victim's mother either would not have spoken with her or would not have provided relevant or useful information such that interviewing her was unnecessary. *See* Opp'n at 14. Moreover, Petitioner fails to establish prejudice. The record is clear that the Government promptly notified Ms. Morgan once it learned of inconsistent testimony concerning the blankets, *see* SER at 422, and Ms. Morgan called an expert witness to confirm the absence of semen on the blankets, arguing that Johnathan's account was accordingly not credible, *id.* at 459–60. This absence of prejudice is further heightened by the strength of the other evidence against Petitioner. Ultimately, Petitioner has not shown a reasonable probability that, had his counsel interviewed Ms. Ramirez, the outcome of his trial would have been different.

Second, Petitioner claims that his counsel's failure to properly investigate allegedly faulty evidence from Johnathan's Blackberry "so undermined the proper functioning of the adversarial process that McLeod's trial cannot be relied on as having produced a just result." Am. Mot. at 38. McLeod states that he attended a bail hearing, seeking pretrial release, on August 1, 2013. *Id.* at 37. McLeod was represented by Shireen Charlick of Federal Defenders of San Diego during the hearing. *Id.* The Government used text messages extracted from Johnathan's Blackberry during the hearing to prove that "McLeod was engaging in sexually suggestive conversations with Johnathan." *Id.* McLeod claims that he informed Ms. Charlick during this hearing that the text messages were not accurate representations of his text message history with Johnathan, *id.*, and argues that, once he voiced these concerns, Federal Defenders had a duty to investigate the Blackberry's chain of custody and the possibility of tampering. *Id.* at 38.

Relatedly, Petitioner claims that his trial counsel failed to "investigate the circumstances surrounding an unknown-named staff member . . . accessing the purported victim's cell phone from police custody during the pre-arrest investigation and connecting to the Verizon network, and deleted data." *Id.* at 48.  On June 1, 2013, Johnathan's mother gave Johnathan's Blackberry to EPD "for them to conduct an investigation into the phones' activities for any potential information of Johnathan's interactions with a person she knew only as 'Tony' (the Defendant)." *Id.* at 30.  On June 3, 2013, "someone, known only as '7G4' removed the phone from EPD's property room, connected it to the Verizon Network and began using the device." *Id.* at 30–31.  The investigation of the Blackberry was assigned to Detective Jackson on June 7, 2013, and he removed the phone from EPD custody on June 10, 2013.  *Id.* at 31.  That same day, Detective Jackson "conducted a Cellebrite digital extraction; a 'logical' download of Johnathan's phone." *Id.*  "The Cellebrite digital extraction has been the focus of much debate and contention and McLeod has consistently challenged the Blackberry's accuracy and the authenticity of Cellebrite's extractions." *Id.* Petitioner argues that the alleged chain of custody issues with the Blackberry "would have become central to his defense" had competent counsel represented him, and "there is a reasonable probability that a 'reasonable investigation' would have produced a different outcome." *Id.* at 39, 41; *see also id.* at 48–49.

According to Petitioner, during his trial, the Government called Detective Jackson as a witness, but "avoided asking Jackson about the chain of custody incident dated June 3, 2013 or about who '7G4' was or what role they played in McLeod's investigation." *Id.* at 32.  When Petitioner's counsel cross-examined Detective Jackson about the June 3, 2013 incident, he indicated that 7G4 "would be one of the property clerks"—he thought Selena Gerving.  *Id.* at 33 (citation omitted).  In 2017, a friend of Petitioner named Eric Wolf called EPD and spoke to someone in the human resources department, who informed him "that Selena Gerving is not '7G4' . . . and that '7G4' does not exist." *Id.* at 34.  Mr. Wolf e-mailed Federal Defenders concerning what he had learned, and on March

5, 2018, Federal Defenders' investigator, Edmund Haskins, was assigned to look into the issue. *Id.* Haskins learned from EPD that property clerks have four-digit ID numbers that begin with the number "1" and that police officers and detectives have four-digit ID numbers that begin with the number "0." *Id.*

The Court finds that the alleged failure to investigate the accuracy of the data extracted from and chain of custody of Johnathan's Blackberry does not rise to the level of ineffective assistance of counsel. Petitioner's counsel reasonably could have concluded that investigating alleged tampering with the victim's phone that occurred before Petitioner had even been arrested and identified as the man with whom Johnathan had been communicating was unlikely to yield information helpful to Petitioner's case, a strategic decision well within professional norms. Moreover, Petitioner has failed to establish prejudice, as the messages, photographs, and videos from the Blackberry independently were authenticated by both Johnathan and his aunt. ER at 357–60, 404–06; SER at 34–35, 46–49. Finally, there is no prejudice because there was overwhelming evidence beyond that extracted from Johnathan's Blackberry to support the jury's guilty verdict. Both Johnathan and Max testified, without relying on the contested messages, that they told McLeod they were in middle school and fourteen or fifteen years old at the time of the incidents in question. *See* ER at 491–92, 700–01. The jury also heard testimony that Petitioner picked Johnathan up in front of a middle school and subsequently engaged in sexual acts with him both in a car and on a plane. ER at 381–404. In light of this independent evidence, among other evidence in the record, Petitioner has not met his burden of establishing that the outcome of the trial likely would have been different had his counsel investigated these alleged issues with the Blackberry evidence's reliability and chain of custody.

Third, Petitioner claims that his appellate attorney, Kristi Hughes, informed him "late into the Appeals stage" that a second Cellebrite download of Johnathan's Blackberry had occurred and that the two reports "were not identical." Am. Mot. at 49. However, Petitioner contends that she refused to send him copies of the CDs of the

downloads because (1) the information was subject to a protective order and (2) the Bureau of Prisons would not allow sexually suggestive photos of a victim into a prison setting. *Id.* She also asserted it was "too late to file anything because the case was too far along in the appeal, and that to bring it to the attention of the district court could harm the appeal." *Id.* She raised the possibility that Petitioner "could always address [this issue] in a [§2255 motion] because McLeod was never allowed to review and utilize the second download in a constitutionally effective manner." *Id.* It appears Petitioner is faulting his trial counsel for failing to pursue the alleged second Cellebrite report. However, it is not clear that the report was available to Petitioner's trial counsel at the time of the trial. Even assuming a second report existed in time and trial counsel failed to pursue that line of investigation, however, Petitioner, who baldly speculates about what differences might have existed between the two Cellebrite reports and how they could have impacted his case, utterly fails to demonstrate a reasonable likelihood that the outcome of his trial would have been different had his counsel pursued this line of investigation. And, given that it is possible the second extraction could have contained even more incriminating evidence, it would have been within the range of acceptable legal representation for his counsel to conclude that pursuing the second report was unlikely to be fruitful.

Fourth, Petitioner claims his counsel was deficient in "fail[ing] to conduct an Independent Forensic Examination of the digital data from Johnathan's Blackberry phone." Am. Mot. at 49. He claims he identified specific messages that Johnathan authored but that the Cellebrite report erroneously attributed to Petitioner. *Id.* at 50. However, as noted *supra*, Johnathan and his aunt authenticated the various messages, pictures, and videos at issue, and there was strong additional evidence of Petitioner's guilt. Accordingly, Petitioner's speculation that an independent forensic examination may have uncovered evidence to exonerate him fails to raise a reasonable likelihood that the outcome of the trial may have been different, and Petitioner thus fails to establish any prejudice from this purported shortcoming in his counsel's investigation.

Fifth, Petitioner claims his trial counsel provided ineffective assistance by failing to adequately investigate the unreliability of Cellebrite technology and its "significant" error rate as to misreported data. Am. Mot. at 50–51. Petitioner argues that adequate investigation would have revealed "that Cellebrite technology is not suitable on Blackberry phones." *Id.* at 51. However, "[n]umerous agencies use Cellebrite or similar devices to retrieve cell phone data." *Hurt v. Dowling*, Case No. 17-CV-005-JED-JFJ, 2019 WL 7340137, at *4 (N.D. Okla. Dec. 30, 2019) (collecting cases). Even the evidence Petitioner cites, *see* Am. Mot. Ex. D, tends to support the fact that "Cellebrite UFED extraction processes are generally accepted as a valid scientific process," *id.* at 9. While Petitioner contends, without citing to any supporting evidence, that Cellebrite is not "suitable" for Blackberry devices, Am. Mot. at 51, the testimony in this case was that an unsupported device would not connect and would require a software update in order to connect, *see* ER at 597–98. Given that Detective Jackson was able to connect to the Blackberry and extract data from it, Petitioner's premise is faulty. Ultimately, not only did Petitioner's counsel act well within the confines of accepted professional judgment in making the strategic decision not to pursue this line of inquiry, in the face of this strong evidence of the suitability and reliability of Cellebrite in criminal prosecutions, but Petitioner also has not met his burden of establishing that the outcome of the trial would have been different had his counsel investigated this issue, given the independent and strong evidence against Petitioner.

Sixth, Petitioner argues that counsel failed to investigate or present evidence about his childhood trauma that would have contextualized Petitioner's actions and intentions. Am. Mot. at 52. Trial counsel's opposition to the Government's motions in limine, filed December 16, 2014, argues that evidence of Petitioner's past abuse should not be precluded from the case, *see* ECF No. 56 at 9–10, and the Court subsequently denied the Government's motion in limine to preclude testimony concerning Petitioner's past abuse, *see* ECF No. 66. Nonetheless, evidence of Petitioner's past trauma was not presented to the jury. Far from supporting the inference, advanced by Petitioner, that this evidences

trial counsel's "fail[ure] to undertake the necessary investigation to develop this important key aspect of [Petitioner's] defense, Am. Mot. at 52, it rather appears counsel later made the strategic decision not to introduce such evidence to the jury,[4] which likely would have needed to be presented through Petitioner's own testimony, potentially opening the door to damaging evidence of Petitioner's history of allegedly sexually abusing other minors.  *See* Opp'n at 15 (citing ECF No. 124 at 28).  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466 U.S. at 690–91.  Counsel's decision to forego investigating, or presenting at trial, evidence that quite possibly would have been damaging to Petitioner falls well within accepted professional standards.  Further, Petitioner has failed to establish, given the strength of the evidence of Petitioner's guilt, how this evidence likely would have resulted in a different outcome.

Seventh, Petitioner claims that his counsel provided ineffective assistance in failing to obtain an independent forensic examination of the airline blankets or to hire a defense expert to address those issues.  Am. Mot. at 54.  However, Petitioner's counsel called as an expert one of the Government's witnesses, Mr. Zoll, a forensic biologist who examined the blankets in question.  *See* ER at 984–87.  Petitioner's counsel elicited testimony that examination revealed no semen stains on either of the two blankets.  *See id.* at 987–89.  Using the Government's witness to elicit this testimony fell well within professional norms.  Moreover, it is unclear how duplicative testimony from an expert

///

---

[4] The Court notes that Mr. McLeod's history was presented extensively at the sentencing phase, *see* ECF No. 152, and considered by the Court in arriving at its sentence, *see* ECF No. 199 at 75:22–76:2 ("While I'm understanding of the upbringing and experiences you've had, Mr. McLeod, I don't think that's an excuse or in any way explains away this conduct because quite the contrary could occur, you could say, 'I never want anybody else to experience this,' and not prey upon the young people that you preyed upon[.]").  This further supports the inference that trial counsel investigated Petitioner's history of abuse and reasonably decided not to present that evidence to the jury.

hired by Petitioner reasonably would have resulted in a different outcome; accordingly, Petitioner has failed to establish any prejudice.

Eighth, Petitioner argues that two orders "chastising defense counsel for late filings" evidence that his case was a low priority and that his counsel was unprepared. Am. Mot. at 55.   However, even assuming such late filings were objectively unreasonable, the Court finds that Petitioner has failed to show prejudice.  Counsel filed Petitioner's opposition to the Government's motions in limine four days late, prompting the Court to continue the hearing.  *See* ECF Nos. 54, 56, 57.  Nonetheless, the Court considered the opposition on the merits and denied in part the Government's motions in limine.  *See* ECF No. 58.  Likewise, while counsel was months late in filing several pretrial motions, *see* ECF Nos. 69, 71, the Court accepted the late-filed motions and continued the trial date, *see* ECF No. 72.  Ultimately, the Court granted several of the motions.  *See* ECF Nos. 83, 84.  Accordingly, the record evidences that counsel filed at least partially successful motions, tending to show that counsel did not deprioritize this case to a constitutionally deficient level; the Court therefore declines to draw the unsupported inference that these two late filings, which did not injure Petitioner, evidence a pattern of subpar effort rising to the level of ineffective assistance of counsel.  Even were such an inference reasonable, the Court finds an absence of prejudice, as Petitioner fails to establish how the outcome of trial otherwise would have been different, particularly given the Government's strong evidence against Petitioner.

Ninth and finally, Petitioner claims that his counsel failed to provide him an effective defense during his sentencing by giving "inadequate and incomplete sentencing presentations."  Am. Mot. at 56.  Specifically, he takes issue with his counsel providing his forensic psychologist with the Cellebrite information, which then "became the center-piece of Dr. Clipson's forensic conclusions," and the Probation Department's reliance on text messages from the Cellebrite data in its presentencing report.  *Id.*  For the reasons provided *supra*, the Court finds unpersuasive Petitioner's argument that his counsel's performance was deficient due to failing to investigate the alleged unreliability of

Cellebrite and the Blackberry data obtained in this case.  Accordingly, the Court also declines to find that counsel's reliance on the Cellebrite data during sentencing was objectively unreasonable, or that Petitioner was prejudiced by that reliance.  Because the information from the Cellebrite report was independently verified and corroborated by other testimony and evidence, Petitioner has not shown a reasonable likelihood that the outcome of his sentencing would have been different had his counsel, the expert she retained, and the Probation Department not relied on the Cellebrite report.  Moreover, Petitioner's counsel provided a thorough and thoughtful sentencing memorandum, *see* ECF No. 152, accompanied by numerous letters in support thereof, *see* ECF Nos. 152-1, 153, 154, and a medical expert's report, *see* ECF No. 160.  These materials, as well as her advocacy during the sentencing hearing, *see* ECF No. 199, fall well within the range of acceptable professional legal services.

In sum, the Court **DENIES** Petitioner's Motion on the ground that various failures to investigate on the part of his counsel constitute ineffective assistance of counsel.

## IV.    Ground 3: Ineffective Assistance of Counsel—Failure to Object/Move

Petitioner's third ground for relief, asserting that he received ineffective assistance of counsel due to his counsel's failure to raise certain objections or file certain motions, is again comprised of several subparts.  As noted *supra* at Section III, to succeed on a claim for ineffective assistance of counsel, "the defendant must show both that counsel's representation fell below an objective standard of reasonableness . . . and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Kimmelman*, 477 U.S. at 375.

First, Petitioner argues that his trial counsel's performance was deficient in failing to object to improper, "factually erroneous and inflammatory" arguments made in the Government's rebuttal closing argument.  Am. Mot. at 56–57.  Petitioner argues that he never "blam[ed] the purported victim(s)," and accordingly, had his counsel objected, "the [C]ourt would have sustained the objection and appropriately declared a mistrial."  *Id.* at 57.  However, "[b]ecause many lawyers refrain from objecting during opening statement

and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir.), *as amended on denial of reh'g* (Apr. 15, 1993) (citing *Strickland*, 466 U.S. at 689).  Here, as addressed more fully *infra* at Section VI, the challenged statement was not an egregious misstatement falling outside professional legal norms.  Petitioner likewise fails to show prejudice, as it is not reasonably likely that the outcome of his trial would have been different had his counsel objected to this single statement comprising only a couple sentences.

Second, Petitioner claims that his counsel failed to object to the Government's knowing use of false testimony.  Am. Mot. at 57.  As an example, Petitioner claims that the Government elicited testimony from Max about how Max had exposed himself to Petitioner via Skype, but "[t]rial counsel knew . . . that the Skype app was not on the I-Pad that Max claimed to have utilized to engage in this activity," so both Petitioner's counsel and the Government knew the testimony in question "was factually impossible, and yet made no objection" to the testimony.  *Id.*  For the reasons provided *infra* at Section VII, the Court finds baseless Petitioner's claim that the Government knowingly elicited false testimony, including the testimony concerning Skype, and "counsel cannot have been ineffective for failing to raise a meritless objection."  *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005).

Third, Petitioner contends his counsel should have moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 at the close of the Government's presentation as to count 13 of the Superseding Indictment—"the count representing Max's allegation."  *Id.* at 58.  First, counsel did make this motion.  *See* ER at 1000 (indicating that the Court denied counsel's renewed Rule 29 motion "as to all counts and elements").  Even were that not the case, however, "[g]enerally, a defendant claiming ineffective assistance of counsel for failure to file a particular motion must not only demonstrate a likelihood of prevailing on the motion, but also a reasonable

probability that the granting of the motion would have resulted in a more favorable outcome in the entire case." *Styers v. Schriro*, 547 F.3d 1026, 1030 (9th Cir. 2008) (citing *Kimmelman*, 477 U.S. at 390–91).  As addressed more fully *infra* at Section VII, the Court finds Petitioner's claim that Max's testimony was "factually impossible" to be without merit; accordingly, the likelihood that counsel would have prevailed on a Rule 29 motion is negligible.  Moreover, it is unlikely that Petitioner would have received a more favorable outcome in the entire case, as the Government's evidence on the remaining ten counts was exceedingly strong, and the Court imposed the sentence on each count to run concurrently.  *See* ECF No. 199 at 83:3–8; ECF No. 213 at 2.  Accordingly, even assuming a constitutional violation, Petitioner has not shown prejudice.

Fourth and finally, Petitioner argues that his counsel was ineffective for failing to object to the reliability of the Cellebrite technology.  Am. Mot. at 58.  For the reasons provided *supra* at Section III, however, the Court finds that Petitioner's arguments concerning the unreliability of Cellebrite are meritless, and "counsel cannot have been ineffective for failing to raise a meritless objection." *Juan H.*, 408 F.3d at 1273.  Further, as discussed above, the non-Cellebrite evidence presented by the Government was very strong.  Accordingly, even were this failure to constitute ineffective assistance, Petitioner has not established prejudice.

In sum, the Court **DENIES** Petitioner's Motion on the ground that various failures to object or move on the part of his counsel constitute ineffective assistance of counsel.

## V.   Ground 4: *Brady* Violations

Petitioner's fourth ground for relief asserts that the Government committed several *Brady* violations.  In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.  "To establish a *Brady* violation, the evidence must be (1) favorable to the accused because it is either exculpatory or impeachment material; (2) suppressed by the government, either willfully or

inadvertently; and (3) material or prejudicial." *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004).  Regarding the suppression prong, "[t]he proponent of a *Brady* claim—i.e., the defendant—bears the initial burden of producing some evidence to support an inference that the government possessed or knew about material favorable to the defense and failed to disclose it." *United States v. Price*, 566 F.3d 900, 910 (9th Cir. 2009) (citations and footnote omitted).  As to the last prong, information is considered "material" when "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)).

As an initial matter, each of the alleged *Brady* violations, detailed more fully below, could have been raised during Petitioner's direct appeal.  Moreover, for the reasons provided throughout this Order, Petitioner has failed to show cause for his failure to raise his *Brady* claims during his direct appeal, actual prejudice, or actual innocence. Accordingly, the Court finds that the purported *Brady* violations are procedurally defaulted.  However, each of the alleged *Brady* violations also fails on the merits.

First, Petitioner claims the Government suppressed exculpatory evidence because it "has never made any attempt . . . to retrieve the deleted cellphone messages, data or metadata, which would be material to proving McLeod's innocence."  Am. Mot. at 61. Petitioner argues that it is "clear" that "the Government only performed a 'logical' extraction on Johnathan's Blackberry, and therefore, suppressed all text messages manually deleted from his device."  *Id.* at 62.  He also claims that the Government's failure to extract data from his iPhone was prejudicial and suppressive.  *Id.* at 63.

Petitioner, however, fails to establish any of the elements of a *Brady* violation as to this argument.  Most importantly, while Petitioner *speculates* that the information in question would have been exculpatory and material, *see id.*, ultimately, the content of information that was not extracted from the devices in question is unknown.  Thus, it cannot be determined whether any data on Johnathan's Blackberry or Petitioner's iPhone was *Brady* material.  *See United States v. Kimball*, No. 15CR0902-JLS, 2022 WL

4110907, at *4 (S.D. Cal. Sept. 7, 2022) (finding no *Brady* violation where contents of missing page from report were unknown, and therefore no facts suggested information contained therein would have been favorable to the defendant); *United States v. Valenzuela*, No. CR 07-00011 MMM, 2008 WL 5381217, at *4 (C.D. Cal. Dec. 22, 2008) ("'As a matter of law, mere speculation by a defendant that the government has not fulfilled its obligations under *Brady v. Maryland* . . . is not enough to establish that the government has, in fact, failed to honor its discovery obligations.'" (quoting *United States v. Upton*, 856 F. Supp. 727, 746 (E.D.N.Y. 1994); citing *United States v. Michaels*, 796 F.2d 1112, 1116 (9th Cir. 1986))). Petitioner has pointed to no evidence, save his meritless inference of tampering, addressed and rejected *supra* at Section III, to suggest that anything on the phones relevant to this case would have been exculpatory; indeed, the content that was extracted tends to suggest the opposite: that additional evidence extracted from the phone may have included further incriminating and illegal material. Moreover, "no *Brady* violation exists when the defense has the ability to obtain any allegedly exculpatory evidence for itself." *Tarkington v. Cnty. of Los Angeles*, No. CV 18-07636-CJC-JC, 2019 WL 1744214, at *6 (C.D. Cal. Mar. 5, 2019). Elsewhere in his Motion, Petitioner contends his trial counsel was ineffective because she had the opportunity, which she elected not to exercise, to obtain an independent forensics expert to extract the data in question. Accordingly, as the defense had the ability to obtain the evidence for itself, there can be no *Brady* violation. Finally, there is no prejudice to Petitioner, because the other evidence of Petitioner's guilt, discussed above in Section III, was significant; thus, there was no reasonable likelihood that the outcome of the trial would have been different had the Government performed a full "physical" extraction on both Johnathan's Blackberry and Petitioner's iPhone. *Cf.* Am. Mot. at 63. Accordingly, Petitioner fails to establish a *Brady* violation on this basis.

Second, Petitioner claims that the Government "fail[ed] to disclose material and exculpatory information demonstrating, *inter alia*, that the government's key witness (Johnathan) had fabricated his trial testimony—that he and McLeod had masturbated

each other on the flight from California, which the government relied on at trial to prove McLeod's intent, and to rebut his defense." *Id.* This *Mooney-Napue* claim requires "the petitioner [to] show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003) (citing *Napue v. Illinois*, 360 U.S. 264, 269–71 (1959)).   As to the "materiality" prong, there generally is no "reasonable likelihood" that the false testimony affected the jury's judgment where defense counsel effectively attacks the witness's credibility on cross-examination.   *See United States v. Renzi*, 769 F.3d 731, 752 (9th Cir. 2014) (citing *United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011)).

Petitioner's claim fails on the first prong, as he offers no evidence that Johnathan's testimony was, in fact, false.   His argument that a lack of semen on the blankets per se means Johnathan manufactured his testimony that he and Petitioner masturbated each other on the airplane is unsupported.   *See* ER at 996 (testimony of Mr. Zoll that it is hypothetically possible that wiping ejaculate off blanket would result in no stain).   As to the second prong, Petitioner merely speculates that the Government had knowledge of this allegedly false testimony; "[a]s noted above, however, [Petitioner] has failed to demonstrate that [Johnathan] testified falsely, so *a fortiori* there is no way that [Petitioner] could have demonstrated that the government knew that [Johnathan] testified falsely." *Zuno-Arce*, 339 F.3d at 891 (citation omitted).   Petitioner offers no evidence to support his inference of the Government's knowledge, and accordingly he fails to meet his burden as to the suppression prong.   *See Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995) ("The government has no obligation to produce information which it does not possess or of which it is unaware.") (citations omitted).   And finally, Petitioner cannot establish materiality, given the significant and strong additional evidence offered against Petitioner, *see supra* Section III; Petitioner's counsel's effective cross-examination of Johnathan about the lack of semen on the blankets, *see* ER at 485–91; the testimony Petitioner's counsel elicited from Mr. Zoll about the lack of semen on the

blankets, *see id.* at 984–89; and the testimony Petitioner's counsel elicited from other witnesses on the flight who claimed neither to have seen the incident nor recalled anything unusual from the flight, *see* Appellant's Opening Brief, Case No. 16-50013, 2017 WL 75671, at *15 (9th Cir.).

In the alternative, Petitioner argues that, even if the Government did not have evidence before trial that Johnathan had fabricated his testimony, it failed to investigate its position and instead "manufactured a bogus justification to explain the results of the forensic tests."  Am. Mot. at 63.  However, Petitioner's claim that the Government violated *Brady* by allegedly failing to investigate its position likewise lacks merit.  When Petitioner's counsel moved for a mistrial or to strike the evidence of Petitioner's touching of Johnathan on the airplane, arguing that the late disclosure concerning whether both blankets had been washed was a *Brady* violation, the Government spoke extensively about the reasonable basis for its position concerning the blankets and the sufficient investigation undertaken in this regard.  *See* SER at 413–23.  The Court thus finds that "[t]his differs from prior cases where a new trial was ordered due to the government's failure to investigate, because in those cases, the government failed to investigate obvious leads."  *Houston*, 648 F.3d at 815 (citations omitted).  Here, Petitioner points to no "obvious leads" that should have alerted the Government to further investigate its position regarding the airline blankets.  Even had the Government's conduct in this regard amounted to a constitutional violation, however, for the reasons provided above, Petitioner has not and cannot establish prejudice as a result.

Third, Petitioner claims that "the Government failed to disclose that law enforcement had tampered with the digital data contained in Johnathan's Blackberry cell phone during the pre-arrest investigation to remove the messages that Johnathan had sent McLeod stating that he and Max were both adults and who were attending college in the San Diego area."  Am. Mot. at 64.  As an initial matter, no legitimate inference can be drawn, based on the evidence before the Court, that law enforcement tampered with Johnathan's Blackberry.  Petitioner had yet to be arrested or identified at the time the

Blackberry was accessed while in the custody of the EPD; accordingly, it is unclear how or why anyone affiliated with law enforcement would have deleted messages between Johnathan and Petitioner.  Even assuming someone in law enforcement accessed the Blackberry and tampered with it during that time, Petitioner fails to present any evidence tending to show "that the government possessed or knew about" the alleged tampering. *Price*, 566 F.3d at 910.  As with the blanket testimony discussed *supra*, there were no "obvious leads" that the accessing of the Blackberry by a person with the ID "7G4" was information meriting further investigation.  *Houston*, 648 F.3d at 815.  Rather, it was reasonable for Detective Jackson and the prosecutors to assume, as they apparently did, that the ID in question belonged to a property clerk.  Finally, the evidence was not material, as there is no likelihood that it would have altered the outcome of the trial.  As detailed *supra* at Section III, the evidence of Petitioner's guilt beyond the messages extracted from the Blackberry was significant.

Relatedly, Petitioner asserts a *Mooney-Napue* claim premised on the Government's alleged knowledge that "Jackson's testimony about who '7G4' was in this case was fabricated."  Am. Mot. at 41.  Given that Detective Jackson does appear to have been incorrect about 7G4 indicating a property clerk, *compare* ER at 588–610 *with* Am. Mot. Ex. A, and assuming this statement was "false," Petitioner cites to no evidence to suggest that the Government knew or should have known of the testimony's falsity.  *See Price*, 566 F.3d at 910.  For the reasons provided *supra*, it was reasonable for the Government and Detective Jackson to assume that the June 3, 2013 activity was that of a property clerk.  Regardless, for the reasons also provided *supra*, this testimony was not material.  Accordingly, Petitioner's *Mooney-Napue* claim based on Detective Jackson's testimony also fails.

Finally, Petitioner claims the Government's "fail[ure] to disclose to McLeod that Cellebrite has a history of producing 'anomalies' with reporting existing data" and "known 'error rates'" constitutes a *Brady* violation.  Am. Mot. at 65.  Even accepting as true, for the sake of argument, Petitioner's claim that Cellebrite produces anomalies and

26

error rates, Petitioner does not provide any evidence showing that the Government was aware of Cellebrite's purported shortcomings.  *See Price*, 566 F.3d at 910.  Moreover, given the strength of the other evidence that supported and independently corroborated Petitioner's guilt, Cellebrite's purported error rate was not material and prejudicial to Petitioner.

For these reasons, the Court **DENIES** Petitioner's Motion to the extent it is premised on the Government's purported *Brady* violations.

## VI.   Ground 5: Denial of Due Process

Petitioner's fifth ground for relief claims several due process violations resulting in a wrongful conviction.

First, Petitioner argues that "[t]he lack of *mens rea* in the production statutes, 18 U.S.C. § 2251, render[s] both the superseding indictment and the jury instructions defective in McLeod's case."  Am. Mot. at 66.  Petitioner argues that, applying the principles of *Rehaif v. United States*, 139 S. Ct. 2191 (2019), "'knowledge of age' is the prerequisite to culpability," so "if the government does not prove that an accused knows the victims' (or fictional victims') purported age, and prove it 'beyond a reasonable doubt,' then the Constitution's presumption of Innocence forbids a conviction."  *Id.* Petitioner raised this argument in his direct appeal, *see McLeod*, 755 F. App'x at 673, and accordingly he is barred from reraising this claim in his habeas petition.  Moreover, for the reasons provided *infra* at Section IX, the Court concludes that 18 U.S.C. § 2251 is not unconstitutional; accordingly, there can be no due process violation on that basis.

Second and relatedly, Petitioner contends that, in light of the alleged unconstitutionality of 18 U.S.C. § 2251, the jury instructions concerning the production counts, which did not "require[ the Government] to prove the requisite degree of scienter," were "defective."  Am. Mot. at 67.  This claim, too, was raised in Petitioner's appeal.  *See* Appellant's Opening Brief, Case No. 16-50013, 2017 WL 75671, at *56 (9th Cir.) (arguing that the district court, in "instruct[ing] the jury that the government did not have to prove that McLeod knew that Johnathan and Max were minors[,] . . . violated

McLeod's due process rights").  Accordingly, Petitioner is barred from presenting this argument again in the present Motion.  Moreover, because the Court rejects the argument that 18 U.S.C. § 2251 is unconstitutional, *see infra* at Section IX, it likewise rejects this derivative argument that the jury instructions concerning the production statutes were defective as a result.

Third, Petitioner argues that the turning on and connecting of Johnathan's Blackberry "to both the Verizon network and the Internet" before the Cellebrite extraction violated Petitioner's due process rights because it could change "the way data looks on the device" and "both the content of a text message and the status notifications of those text messages."  Am. Mot. at 68.  Petitioner identifies no cause for his failure to raise this argument on appeal, and he evidences no actual prejudice or innocence to excuse his procedural default.  Even were this claim not procedurally defaulted, however, it fails on the merits.  As explained *supra* at Section III, even if the Blackberry was connected to a network on June 3, 2013, and even if evidence from the Blackberry were changed or defective as a result, Petitioner fails to establish any prejudice as a result given the strength of the remaining and independent evidence of his guilt.

Fourth, according to Petitioner, the Government's "mis-stating [of] trial evidence" by "call[ing] McLeod's closing arguments a 'blame the child' presentation" was a due process violation.  Am. Mot. at 68.  Again, because this claim could have been raised during Petitioner's direct appeal and he has provided no excuse for failing to do so, this claim is procedurally defaulted.  However, the claim additionally lacks merit.  First, Petitioner's defense strategy largely comprised undermining the testimony of Max and Johnathan to establish that they were lying about their interactions with Petitioner; accordingly, characterizing his defense as "blame the child" was not a misstatement.  At any rate, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned[,] [t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005) (quoting *Darden*

*v. Wainwright*, 477 U.S. 168, 181 (1986)) (internal quotation marks omitted) (alterations in original).  Even assuming for the sake of Petitioner's claim that this fleeting statement was improper, it did not infect the trial with unfairness.  It does not, as Petitioner argues, misstate the evidence; rather, it is an invited response to Petitioner's counsel's closing argument that, given the weight of the evidence against Petitioner, was unlikely to influence the jury's decision.  *See Darden*, 477 U.S. at 182 (finding no due process violation where prosecutor, during closing argument, *inter alia* implied that the death penalty was the only guarantee against future criminal acts by the defendant and made several offensive and emotionally charged comments).

Fifth and finally, Petitioner claims the Government violated his due process rights by misleading the Ninth Circuit about the trial record by making various false statements "in bad faith."  Am. Mot. at 68–70.  Petitioner raised this claim during his direct appeal, and therefore he is barred from reraising it here.  *See* Appellant's Reply Brief, Case No. 16-50013, 2017 WL 6550764, at *5 (9th Cir.) ("In its response brief, much as it did at trial, the government tries to paint McLeod in the worst light possible, sometimes by misconstruing the record.").  Even assuming the claim is properly presented in the instant Motion, however, it also fails on the merits.  First, comparing the statements Petitioner challenges with the voluminous record, the challenged statements are accurate representations of the evidence presented during trial; accordingly, they are not misleading.  This *Mooney-Napue* thus claim fails at the first step.  But even assuming for the sake of argument that any of the challenged statements were misleading, and knowingly so, Plaintiff fails to establish materiality.  The Ninth Circuit, which had access to the relevant portions of the record, could verify the Government's claims for itself— and presumably did, given Petitioner's argument that the Government's brief "misconstrued" the evidence and his exhortation to "resist the government's attempts to persuade by ignoring the entire trial record" and instead "look[] at the record as a whole[.]"  *See* Appellant's Reply Brief, Case No. 16-50013, 2017 WL 6550764, at *5–7 (9th Cir.).  Accordingly, Petitioner fails to show any prejudice as a result of the alleged

misstatements, which were explicitly brought to the Ninth Circuit's attention by Petitioner's counsel.

For these reasons, the Court **DENIES** the Motion as to Petitioner's fifth ground.

## VII.    Ground 6: Knowing Presentation of False Evidence by the Government

Petitioner's sixth ground for relief claims that the Government knowingly presented false evidence and asked the jury to draw false inferences.

First, Petitioner claims that the Government elicited false testimony from Johnathan that Petitioner and Johnathan masturbated one another on the flight and used airline blankets to clean themselves up, despite knowing that the forensic examination of the blankets showed no evidence of semen, "thus establishing that Johnathan's version of events was concocted." Am. Mot. at 71. The Government then "manufacture[d a] theory" that Johnathan's mother had washed the blankets before they were taken into evidence, which theory the Government "bolster[ed]" by "elicit[ing] testimony from criminologists to that effect," despite the Government knowing, from Johnathan's mother, that she had not done so. *Id.* at 71–72. This argument, which was available on direct appeal, is procedurally defaulted; moreover, the Court addressed and rejected the argument that the Government knowingly presented false evidence to this effect *supra* at Section V.

Second, Petitioner claims that the Government presented false testimony from Max that Petitioner had convinced Max to expose himself to Petitioner over Skype, despite the Government knowing "that the Skype app was not on Max's I-Pad device and, therefore, that Max's testimony was not only false but fabricated." Am. Mot. at 72. Petitioner could have raised this issue on direct appeal, and has offered no cause, actual prejudice, or actual innocence to excuse his failure to do so; accordingly, this claim is procedurally defaulted. However, the claim also fails on its merits. First, Petitioner does not establish that the testimony was false. The record is clear that Skype could have been installed on but deleted from Max's iPad, and Max testified that this was, in fact, what happened. *See* ER at 799–800, 842–42; SER at 430, 450. Accordingly, Max's testimony about talking

with Petitioner over Skype is not necessarily fabricated, as Petitioner contends.  At any rate, Petitioner has failed to establish materiality given that his counsel had the opportunity, which she exercised, to effectively cross-examine Max about his testimony concerning his Skype interactions with Petitioner and undermine his credibility.  *See* ER at 746–96, 801–02.  She further cross-examined Ms. Kranz about the absence of the Skype application on Max's iPad.  *See id.* at 840–41.  Accordingly, this *Mooney-Napue* claim fails.

Third, Petitioner argues that the Government's offering of the defective Cellebrite extraction report "allowed the jury to draw false inferences of [the Government's] evidence." Am. Mot. at 72–73.  Further, "to bolster its manufactured theory of McLeod's case, the Government allowed Jackson to offer his incomplete and unreliable extraction report and was able to capitalize on its evidentiary concealments to change the characteristics of McLeod's interactions with Johnathan—making McLeod appear guilty of conversations he did not have." *Id.* at 73.  This argument was available at the time of Petitioner's direct appeal and is therefore procedurally defaulted.  But, again, the Court has considered and rejected on the merits Petitioner's arguments that the Government knew that the Cellebrite data was faulty and/or that Detective Jackson perjured himself on the stand with the Government's knowledge and approval.  *See supra* Section V. There is, therefore, no resultant due process violation.

Fourth, Petitioner claims the Government presented false evidence to the jury in the form of "a new text message report that had been modified by a witness, Darren Bennett, an FBI scientist, who had re-created, modified and omitted material information in the new report." Am. Mot. at 74.  Petitioner argues that the Government "misle[]d the Court into believing that it should allow the introduction of the bubblification report as a demonstrative exhibit." *Id.*  Because "McLeod was being held accountable to every-single-word that was presented in this case," "any omissions in McLeod's case would change the appearances of his interactions with Johnathan 10,000-fold, thus, making McLeod appear guilty of things he had not said nor done." *Id.* at 75.  This ground, too, is

procedurally defaulted, as it was available at the time of Petitioner's direct appeal, and he has offered no cause, actual prejudice, or actual innocence to justify his failure to raise this argument at that time. But the claim additionally fails on the merits. Mr. Bennett testified extensively, both during direct examination and on cross, concerning the manner in which the demonstrative exhibit in question was created, including the fact that it was not a comprehensive depiction of all the text messages between Petitioner and his victim. *See* ER at 844–72. Accordingly, Petitioner fails to show that this demonstrative exhibit was false, or that the Government knew it to be so. At any rate, to the extent the "bubblification" demonstrative was false or misleading, it was not material. Petitioner's counsel thoroughly cross-examined Mr. Bennett concerning the demonstrative exhibit, *see id.* at 850–69, and during her closing, she implored the jury to remember that the demonstrative exhibit was not a full account of Petitioner's communication history with Johnathan and to go through all their messages to get a complete picture, *see* SER at 454.

For these reasons, the Court **DENIES** the Motion to the extent it contends that the Government knowingly presented false evidence.

## VIII. Ground 7: Appellate Counsel's Conflict and/or Ineffective Assistance

Seventh, Petitioner claims that his appellate counsel had a conflict of interest while working on his appeal or, alternatively, provided ineffective assistance.

To the extent Petitioner contends his appellate counsel had a conflict of interest, "[he] must show 'that an actual conflict of interest adversely affected his lawyer's performance.'" *United States v. Moore*, 159 F.3d 1154, 1157 (9th Cir. 1998) (quoting *Garcia v. Bunnell*, 33 F.3d 1193, 1198 (9th Cir. 1994)). "[Petitioner] must prove actual conflict, not just a possibility of conflict, 'through a factual showing on the record.'" *Id.* (quoting *Morris v. California*, 966 F.2d 448, 455 (9th Cir. 1991)). "Once an actual conflict is shown, [Petitioner] need demonstrate only that some effect on counsel[']s handling of particular aspects of the trial was likely," and prejudice is presumed. *Id.* (citing *United States v. Miskinis*, 966 F.2d 1263, 1268 (9th Cir. 1992)) (internal quotation marks omitted). "If, however, there is only a possibility of conflict, [Petitioner] must

meet the 'performance and prejudice' standard of *Strickland v. Washington*[.]"   *Id.* (citations omitted).

"Claims of ineffective assistance of appellate counsel are reviewed according to the standard announced in *Strickland v. Washington*[.]"   *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002) (citation omitted).   "First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue."   *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010) (citing *Smith*, 528 U.S. at 285; *Wildman v. Johnson*, 261 F.3d 832, 841–42 (9th Cir. 2001)).   "Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal."   *Id.* (citing *Smith*, 528 U.S. at 285–86).

Essentially, Petitioner claims that Federal Defenders had a conflict of interest because Federal Defenders' Trial Department failed to develop and preserve his claims concerning the unreliability of Cellebrite; once Federal Defenders' Appellate Department learned that fact, "it was incumbent on the Appeals Department to recognize that its office had failed to argue and preserve an important issue, and therefore, conflict-off of McLeod's Direct Appeal."   Am. Mot. at 76–77.   According to Petitioner, "[a] conflict-free attorney would have been able to attack Federal Defenders['] failure on this and other important points, but because it was the same office representing both the Trial and Direct Appeal, Federal Defenders was undertaking and representing McLeod's Direct Appeal while in conflict."   *Id.* at 77–78.   Petitioner concedes that it is uncommon for claims of ineffective assistance of counsel to be brought in a direct appeal, but he claims "his case is that exception."   *Id.* at 80.

The Court, however, finds this argument lacks merit.   It appears, based on the exhibits appended to the Amended Petition, that Petitioner was aware that "[Federal Defenders] can't represent him on appeal when he's filing an IAC claim, because all the

lawyers in [the] office are treated as one." Am. Mot. Ex. A at 8. According to a memorandum to file from Federal Defenders dated August 25, 2017, following a call with Petitioner's friend Mr. Wolf, Mr. Wolf expressed a strong interest in pursuing arguments that would have conflicted Federal Defenders from representing Petitioner, but Mr. Wolf indicated to Federal Defenders "that Tony doesn't want new counsel at this point." *Id.* Ultimately, "[Mr. Wolf] said he would talk to [Petitioner] about what w[as] discussed and then Tony would call Vince and discuss what he wanted to do." *Id.* at 9. The upshot was that Federal Defenders served as Petitioner's appellate counsel. Given that Petitioner was aware of the potential of a conflict and forged ahead with Federal Defenders as appellate counsel, he waived the potential conflict of interest. Accordingly, there was no conflict in Federal Defenders continuing to represent Petitioner during his appeal.

Alternatively, Petitioner claims that he was denied effective assistance of appellate counsel because his counsel failed to file a motion before this Court presenting newly discovered evidence concerning Detective Jackson's alleged false testimony about the identity of "7G4" and the Government's failure to correct said testimony. Am. Mot. at 78. He further claims his appellate counsel was not effective because they failed to raise meritorious issues on his direct appeal, including Cellebrite's unreliability and purported prosecutorial misconduct and perjury during his trial. *Id.* at 79. He also appears to argue that counsel was ineffective in failing to preserve an argument that Petitioner, as an LGBTQ man, is a member of a protected class who was entitled to (and, inferentially, failed to receive) certain protections during voir dire and the jury's empanelment—seemingly, the inclusion of LGBTQ jurors. *Id.* at 81–82.

For the reasons provided *supra*, Petitioner's arguments concerning Cellebrite's unreliability, Detective Jackson's purportedly false testimony, the identity and role of "7G4" with regards to the custody of the Blackberry, prosecutorial conduct, and perjury lack merit; accordingly, Petitioner cannot establish a claim for ineffective assistance of appellate counsel premised on these alleged failures. *See Boag v. Raines*, 769 F.2d 1341,

1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance.") (citing *Cooper v. Fitzharris*, 551 F.2d 1162, 1166 (9th Cir. 1977)).   In a similar vein, to the extent Petitioner claims that his appellate counsel prejudiced his direct appeal by failing to raise an ineffective assistance of counsel claim based on his trial counsel's failure to hire a forensic expert for the blanket evidence in tandem with the Rule 403 argument that was raised on appeal, the claim also fails.  For the reasons provided *supra* at Section III, the ineffective assistance of counsel claim premised on Petitioner's trial counsel's failure to hire an independent forensic expert is meritless; accordingly, appellate counsel's failure to raise a meritless claim together with a claim that was rejected on appeal was not unreasonable.  *See Boag*, 769 F.2d at 1344. And given that both arguments ultimately lacked merit, there was no reasonable probability that the outcome of the appeal would have been different but for the failure to raise them together.

Finally, Petitioner's claim that his appellate counsel was ineffective for failing to argue that the lack of LGBTQ representation on the jury denied Petitioner his constitutional rights and "would have had a meaningful impact on how the jury deliberated," Am. Mot. at 82, fails.  To the extent this claim derives from the Sixth Amendment, the Supreme Court has clearly articulated that, "'in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population.  Defendants are not entitled to a jury of any particular composition.'"  *Holland v. Illinois*, 493 U.S. 474, 483 (1990) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)).  Because Petitioner was not entitled to a jury containing at least one LGBTQ juror, his argument is baseless, and Petitioner's counsel could not be ineffective for failing to make a meritless argument.  *See Boag*, 769 F.2d at 1344.  To the extent this claim derives from the Equal Protection Clause, it remains fatally detective.  The Ninth Circuit has stated:

/ / /

> To establish a prima facie equal protection case under *Castaneda*[*v. Partida*, 430 U.S. 482, 494 (1977)], a party must: "(1) establish that the group, of which the appellant is a member, is 'one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied;' (2) prove the degree of underrepresentation 'by comparing the proportion of the group in the total population to the proportion called to serve as . . . jurors, over a significant period of time;' and (3) discriminatory intent."

*United States v. Hernandez-Estrada*, 749 F.3d 1154, 1166 (9th Cir. 2014) (quoting *United States v. Esquivel*, 88 F.3d 722, 725 (9th Cir. 1996)).  Petitioner points to no data to suggest that persons identifying as LGBTQ are underrepresented in the jury pool, and even assuming they are, he points to no discriminatory intent causing the underrepresentation.  Accordingly, Petitioner's equal protection claim is likewise defective, and counsel was not ineffective for failing to make the argument.  *See, e.g.*, *Demirdjian v. Sullivan*, No. CV 04-8245-GHK(JTL), 2009 WL 2767673, at *11 (C.D. Cal. Aug. 26, 2009) (finding Black defendant's equal protection claim premised on lack of racial representation to lack merit, and denying claim counsel was ineffective for advancing the argument), *aff'd sub nom. Demirdjian v. Gipson*, 832 F.3d 1060 (9th Cir. 2016).

In light of the foregoing, the Court **DENIES** Petitioner's Motion to the extent it argues a conflict of interest on the part of his appellate counsel or appellate counsel's ineffective assistance.

## IX. Ground 8: Unconstitutionality of 18 U.S.C. § 2251(a)

Petitioner's eighth ground for relief contends that 18 U.S.C. § 2251(a) is unconstitutional because it contains no *mens rea* requirement.  Am. Mot. at 82 (citing *Rehaif*, 139 S. Ct. 2191).

As an initial matter, the Government contends, and Petitioner does not dispute, that this ground for relief was raised in Petitioner's direct appeal and is therefore foreclosed in the instant Motion.  *See* Opp'n at 22, 22 n.6.  The Court agrees.  *See, e.g.*, *Hayes*, 231

F.3d at 1139 ("When a defendant has raised a claim and has been given a full and fair opportunity to litigate it on direct appeal, that claim may not be used as basis for a subsequent § 2255 petition.") (citation omitted).

However, even addressing this claim on the merits, this Court is bound by the Ninth Circuit's decision in *United States v. United States District Court for the Central District of California, Los Angeles, California*, which held that, given Congress's deliberate omission of the defendant's awareness of the subject's minority as an element of the offense, "[t]here is thus little doubt that knowledge of the minor's age is not necessary for conviction under section 2251(a)." 858 F.2d 534, 538 (9th Cir. 1988) (citation omitted). The Supreme Court's decision in *Rehaif* does not, contrary to Petitioner's arguments, render § 2251(a) unconstitutional. Although the Supreme Court, in *Rehaif*, found "that in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm," 139 S. Ct. at 2200, the Court explicitly noted that "[w]hether a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent," *id*. at 2195 (citation omitted). As noted above, as to § 2251(a), Congress's clear intent was to not require scienter, as the House of Representatives deleted the word "knowingly" from the bill. *U.S. Dist. Ct.*, 858 F.2d at 538 (citations omitted). Accordingly, this Court is bound to follow Ninth Circuit law and find that the absence of a scienter requirement in § 2251(a) is not unconstitutional. Accordingly, the Court **DENIES** Petitioner's Motion on this ground.

## X.    Ground 9: Actual Innocence

In his ninth ground for relief, Petitioner asserts his actual innocence, apparently as a means of overcoming procedural default. Although Petitioner asserts that he "has always maintained his actual innocence," he merely attacks the sufficiency of the evidence against him and the credibility of the witnesses who testified against him. *See* Am. Mot. at 83–85. For instance, Petitioner claims that the Government, "[c]onfronted

with the fact that [its] circumstantial case against McLeod was weak," "allowed Max to manufacture a bogus story about an Internet encounter," thereby "plac[ing] an unfair thumb on the scales of McLeod's trial" and "allow[ing] the jury to draw false and improper inferences." *Id.* at 83. He further argues that "the government produced no evidence that the Skype Video Service had ever been installed on Max's device." *Id.* at 84. In fact, he claims that "the Government's expert, Sarah Kranz, . . . found nothing supporting any Skype Video chats" when she forensically analyzed Max's iPad, and that Max was living in his new home, with no Internet service, at the time in question. *Id.*

As an initial matter, these are all arguments that Petitioner could have raised on direct appeal and that are therefore procedurally defaulted, given Petitioner's failure to establish cause, actual prejudice, or actual innocence. Even considering this argument on the merits, however, "[i]t is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623–24 (citing *Sawyer*, 505 U.S. at 339). "'To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.'" *Stephens v. Herrera*, 464 F.3d 895, 898 (9th Cir. 2006) (citing *Bousley*, 523 U.S. at 623; *Lorentsen v. Hood*, 223 F.3d 950, 953 (9th Cir. 2000)). Here, "the evidence against [Petitioner] was sufficiently strong that [the Court] cannot conclude that it is more likely than not that no reasonable juror . . . would have found him guilty." *Stephens*, 464 F.3d at 899 (finding petitioner failed to make out claim of actual innocence where he attacked reliability of co-conspirators' testimony and sufficiency of evidence). Accordingly, the Court **DENIES** Petitioner's Motion on this ground.

## XI.   Ground 10: Cumulative Effect of Trial Counsel's Incompetent Failures

In his tenth and final ground for relief, Petitioner asserts "that the cumulative effect of his trial counsel's errors support a determination that he received constitutionally ineffective assistance of counsel," as his counsel's failure to investigate prevented him from "secur[ing] a mitigated agreement." Am. Mot. at 85.

/ / /

"Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their cumulative effect prejudiced the defendant." *Ceja v. Stewart*, 97 F. 3d 1246, 1254 (9th Cir. 1996) (citing *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992)). However, it is also true that where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation. *See Rup v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996). Because the Court finds no constitutional errors by counsel, there can be no cumulative error. Accordingly, the Court **DENIES** Petitioner's Motion on this ground.

## MOTIONS TO APPOINT COUNSEL

Petitioner requests appointment of counsel. *See generally* ECF Nos. 263, 271, 275 (collectively, "Counsel Motions"). However, "the sixth amendment right to counsel does not apply in habeas corpus actions." *Knaubert v. Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986) (citing *Dillon v. United States*, 307 F.2d 445, 446–47 & n.3 (9th Cir. 1962); *Anderson v. Heinze*, 258 F.2d 479, 481 (9th Cir. 1958)). Although "18 U.S.C. § 3006A(g) authorizes a district court to appoint counsel to represent a habeas petitioner whenever 'the court determines that the interests of justice so require . . .'," "[u]nless an evidentiary hearing is required, the decision to appoint counsel is within the discretion of the district court." *Id.* (citing *Bashor v. Risley*, 730 F.2d 1228, 1234 (9th Cir. 1984); Rule 8, 28 U.S.C. foll. § 2254). Because the Court has determined that an evidentiary hearing is not required, *see supra* p. 5, and because Petitioner has ably developed and articulated his claims pro se, the Court finds the interests of justice do not require the appointment of counsel and **DENIES** Petitioner's Counsel Motions.

## CONCLUSION

For the foregoing reasons, the Court **DECLINES** Petitioner's request for an evidentiary hearing (ECF No. 272), **DENIES AS MOOT** Petitioner's Discovery Motion (ECF No. 263) and Extension Request (ECF No. 275), **DENIES** Petitioner's § 2255 Motion (ECF Nos. 240 & 272), and **DENIES** Petitioner's Counsel Motions (ECF Nos. 263, 271 & 275). Additionally, the Court **DENIES** Petitioner a COA, as Petitioner has

not made a substantial showing that he has been denied a constitutional right.  *See* 28 U.S.C. § 2253(c)(2) (providing that a COA shall issue "only if the applicant has made a substantial showing of a denial of a constitutional right").  The Clerk of the Court **SHALL ENTER JUDGMENT** accordingly and **SHALL CLOSE** the file.

      **IT IS SO ORDERED.**

Dated:  July 24, 2023

                         Hon. Janis L. Sammartino
                         United States District Judge

13-CR-2297 JLS
20-CV-853 JLS